UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| GERARDO A. ANGULO-MESTAS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDITORIAL TELEVISA INTERNATIONAL, S.A. and ET PUBLISHING INTERNATIONAL, INC., <br><br> Defendants. <br> -------------------------------------------------- <br><br> BANCO POPULAR DE PUERTO RICO, <br><br> Intervenor. | Civil No. 09-1830 (JAF) |

**OPINION AND ORDER**

Plaintiffs, Gerardo A. Angulo-Mestas and several companies controlled by him, brought an action against Defendants in diversity. (Docket No. 1.) Plaintiffs sought to compel Defendants to surrender certain properties in Defendants' possession that allegedly constituted collateral for Plaintiffs' debt obligations to Westernbank Puerto Rico ("WBPR"). (Id.) WBPR intervened in this case under Federal Rule of Civil Procedure 24, seeking a declaratory judgment to establish its ownership of such collateral. (Docket No. 59.) We substituted Intervenor Banco Popular de Puerto Rico for WBPR in this case, after Banco Popular took over the operations of WBPR under an FDIC-supervised liquidation and transfer of assets. (Docket

Civil No. 09-1830 (JAF) -2-

Nos. 131; 132.) Intervenor moves for summary judgment under Federal Rule of Civil Procedure 56(c) (Docket No. 66), and Defendants oppose (Docket No. 96).

## I.

## **Factual and Procedural Synopsis**

We derive the following uncontested facts from the parties' briefs and submissions (Docket Nos. 1; 59; 65; 66; 96) and the record in this case.[1] Plaintiffs are engaged in the business of publishing and distributing periodicals in Puerto Rico. Defendants are also publishers. WBPR is a Puerto Rico banking institution that ceased operations on April 30, 2010. (Docket No. 131.)

Through a series of secured transactions, WBPR became creditor to Plaintiffs with security interests in various assets owned by Plaintiffs. In one of these transactions, WBPR lent Angulo-Mestas $6,500,000 under Loan No. 7350020579 on March 8, 2005. (Docket No. 1-3.) In exchange, Angulo-Mestas executed a note payable to WBPR in the amount of $6,500,000 plus interest. (Id.) To secure this loan, WBPR concluded a "Pledge and Security Agreement" with Angulo-Mestas and ten entities controlled by him. (Docket No. 1-2.) This security agreement listed as collateral "Accounts":

> All presently existing or hereafter emerging accounts of
> [Angulo-Mestas] and [the ten companies]. The term "Accounts"
> in addition to the definition of accounts contained in the Uniform
> Commercial Code as adopted in Puerto Rico, means all accounts,

---

[1] Because Intervenor has not opposed Defendants' statement of uncontested facts (Docket No. 96-2), we treat these facts as admitted to the extent they are supported by evidence in the record. See L. Cv. R. 56(e).

>       accounts receivable, receivables, . . . amounts due or to become
>       due . . . , all rights to the payment for goods or services sold or
>       leased, letters and credit and the payments and rights to receive
>       payment thereunder, . . . contract rights, . . . and all other debts,
>       obligations, and liabilities in wherever form now or hereafter
>       owing to [Angulo-Mestas] and [the ten companies], now existing
>       or hereafter acquired or arising, . . . and all cash . . . proceeds of
>       the foregoing . . . .[2]

(Id. at 2.) As a publisher, Angulo-Mestas owns certain magazines and is entitled to receive payment for the sales of such publications. (See Docket Nos. 1-13; 1-16.)

Under the security agreement, Angulo-Mestas and the ten companies would be in default of their obligations if any of them failed to timely pay their debt obligations to WBPR. (Docket No. 1-2 at 6-7.) In that event, all debts would be accelerated and become payable immediately. (Id.) In addition, WBPR would be able to enforce its "security interest in any manner permitted by law" and take possession of any collateral listed in the agreement. (Id.)

Previously, on January 31, 1973, Defendants formed a distribution agreement with Agencia de Publicaciones de Puerto Rico, Inc. ("APPR"), an entity controlled by Angulo-Mestas, granting APPR the right to distribute Defendants' publications in Puerto Rico. On October 30, 2007, Defendants terminated this distribution agreement to form a new distribution arrangement with a different company, Distribuidora Editoriales, LLC ("DE"). (Docket Nos. 1-

---

[2] Defendants argue that we should not consider the "Pledge and Security Agreement" because it would be inadmissible at trial. (Docket No. 96-2.) On summary judgment, we may only consider material that has evidentiary value. Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). The contract would be admissible as relevant evidence of WBPR's security interest in Plaintiffs' collateral. See Fed. R. Evid. 402. As Defendants cite no authority to rebut this threshold finding of admissibility, we reject their challenge.

Civil No. 09-1830 (JAF)                                                                                                -4-

13; 1-14.) In exchange for the cessation of APPR's obligations by novation, Angulo-Mestas agreed to assume a portion of the trade debt of $4,938,905.54 that had accumulated under the former agreement. (Docket No. 1-13.) Angulo-Mestas intended to repay $2,198,100.19 of the trade debt by assigning to DE the right to sell several of his publications and requiring DE to remit the proceeds of such sales directly to Defendants rather than to him.[3] (Id. at 2.) Under this arrangement, DE would remit $10,000 per week until the end of 2007, and $15,000 per week thereafter. (Id.) Angulo-Mestas represented to Defendants that he had full rights to these sales receipts that he assigned to Defendants. (Id. at 3-4.) Defendants were unaware of WBPR's claim to the same accounts. (Docket No. 96-2.)

On May 12, 2009, WBPR informed Angulo-Mestas that he was in default on his debt obligations under Loan No. 7350020579, owing $6,396,540.92 in principal and interest. (Docket No. 1-18.) On August 10, 2009, WBPR filed copies of the aforementioned "Pledge and Security Agreement" with the Puerto Rico Department of State as part of an UCC-1A-PR financing statement. (Docket No. 59-2.)

On August 20, 2009, Plaintiffs filed a complaint in federal court, alleging that WBPR is entitled to certain "Trade Debt Payments" made to Defendants in satisfaction of APPR's trade debt. (Docket No. 1.) Plaintiffs sought, inter alia, declaratory and injunctive relief ordering Defendants to remit such payments to WBPR on the basis of WBPR's alleged status as a

---

[3] As part of its distribution agreement with Defendants made the same day, DE assumed $1,507,807.07 of the trade debt incurred by APPR. (Docket No. 1-15.) DE paid $546,563.32 immediately and agreed to remit the balance in three equal installments from late 2007 to early 2008. (Id.)

Civil No. 09-1830 (JAF)                                                                                          -5-

secured creditor.  (Id.)  The same day, Plaintiffs applied for a temporary restraining order ("TRO") pending the court's resolution of its equitable claims.  (Docket Nos. 2; 8.)  On September 8, 2009, we granted Plaintiffs' application and issued a TRO that, inter alia, ordered Defendants to deposit any "Trade Debt Payments" received after May 12, 2009, with this court, and to instruct DE to further remit such payments to this court, pending the resolution of the case.  (Docket No. 26.)

Pursuant to our TRO, Defendants deposited $81,906.83 with this court on September 16. (Docket No. 41.)  According to Defendants, the funds constitute "the total amount of Trade Debt Payments received by Defendants from Plaintiffs' publications after May 12, 2009." (Docket No. 119.)  Pursuant to our TRO and later orders, DE made four deposits with this court, attributing these funds to net proceeds from the sale of Angulo-Mestas' magazines that DE otherwise would have remitted to Defendants:  $33,470.24 on October 8 (Docket No. 61); $33,215.04 on November 17 (Docket No. 81); $64,596.97 on November 24 (Docket No. 87); and $21,680.38 on February 11, 2010 (Docket No. 112).

On September 28, 2009, WBPR moved to intervene under Federal Rule of Civil Procedure 24(a)(2) (Docket No. 59), and Defendants opposed (Docket No. 62).  WBPR sought a declaratory judgment as to its rights to Plaintiffs' collateral, monies deposited by Defendants and DE with this court, and further "Trade Debt Payments."  (Docket No. 59.)  On October 21, WBPR moved for summary judgment on its claims under Federal Rule of Civil Procedure 56(c) (Docket No. 66), and Defendants opposed (Docket No. 96).

On January 7, 2010, Magistrate Judge McGiverin issued a Report and Recommendation finding that Plaintiffs' claims are committed to arbitration and that the court should allow WBPR's intervention. (Docket No. 108.) Adopting these findings on February 12, we dismissed Plaintiffs' complaint and granted WBPR's motion to intervene. (Docket No. 115.)

Noting the dismissal of Plaintiffs' complaint, Defendants moved on March 25 for disbursement of the funds deposited with this court, totaling $234,869.46. (Docket No. 119.) WBPR opposed on March 26 and moved for an entry of default against Defendants under Federal Rule of Civil Procedure 55. (Docket No. 120.) Defendants replied in opposition (Docket No. 127), and WBPR surreplied (Docket No. 129). WBPR also moved for reconsideration of a previous order issued by this court. (Docket No. 126.) On May 21, we substituted Intervenor for WBPR in this case because Intervenor is the successor to WBPR's business entity. (Docket Nos. 131; 132.)

## II.

### Standard for Summary Judgment

We grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party and "material" if it affects the outcome of the case. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

The movant carries the burden of establishing that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In evaluating a motion for summary judgment, we view the record in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must 'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (quoting Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)). The nonmovant "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

We may also grant summary judgment sua sponte if discovery has progressed sufficiently for the court to determine relevant facts and the target has at least ten days' notice to contest the impending judgment. Stella v. Town of Tewksbury, 4 F.3d 53, 55-56 (1st Cir. 1993).

**III.**

**Analysis**

The sole issue before this court is whether Intervenor's rights to certain accounts receivable as a secured creditor trump Defendants' rights as assignees of the same accounts. (See Docket Nos. 66; 96.) For the reasons stated below, we decide in favor of Defendants.

Puerto Rico enacted a modified version of Article 9 of the Uniform Commercial Code to govern secured transactions. See 19 L.P.R.A. §§ 2001–2207 (2005). Accounts may be used

as collateral in such transactions. See § 2006. A security agreement may include collateral acquired by the debtor after the formation of the agreement "if the debtor acquires his rights in such collateral . . . in the ordinary course of his business." § 2008. A creditor's security interest attaches to the debtor's collateral when "the debtor has signed a security agreement which contains a description of the collateral"; "value has been given"; and "the debtor has rights in the collateral." § 2053(1)–(2). Upon attachment of the security interest, the creditor becomes a secured party with an enforceable right in the collateral. See id. Generally, if the secured party wishes to perfect his interest in the collateral, he must file a financing statement with the relevant authority in Puerto Rico. See § 2102(1).

The secured party's right to enforcement is tempered in some instances by protections afforded to good-faith transferees of certain collateral. See § 2102(1)(c)–(d). Where the collateral is an account assigned by the debtor to a transferee who both gave value for the assignment and lacked knowledge of the secured party's interest, and the secured party has not perfected his interest, the secured party's unperfected interest is subordinate to the right of the transferee. § 2102(1)(d); accord U.C.C. § 9-317(d) & cmt. 6 (2005) (clarifying the priority of good-faith transferees of accounts who give value before secured party's perfection). Although the statutes on secured transactions do not define "value", a broad definition appears in the statute pertaining to negotiable instruments: "generally, . . . any consideration sufficient to support a simple contract." 19 L.P.R.A. § 451(44)(d).

Civil No. 09-1830 (JAF)                                                                                                                    -9-

In the case before us, WBPR concluded its security agreement with Angulo-Mestas on March 8, 2005, which listed "hereafter emerging accounts" of Angulo-Mestas as after-acquired collateral. (Docket No. 1-2.) WBPR gave value for this security interest by issuing Loan No. 7350020579 in favor of Angulo-Mestas. (See Docket No. 1-3.)

When Angulo-Mestas assigned the right to sell his magazines to DE in late 2007, he created accounts receivable for the sale of said publications and was entitled to receive payments from DE. (See Docket Nos. 1-13; 1-16.) Because these accounts receivable arose in the ordinary course of Angulo-Mestas' business after the formation of the security agreement, such accounts became after-acquired collateral under the 2005 agreement (Docket No. 1-2). See 19 L.P.R.A. § 2008. As the security agreement includes after-acquired accounts as collateral, WBPR gave value for this interest, and Angulo-Mestas had rights in the accounts receivable, WBPR has an enforceable interest attached to said accounts. See § 2053(1)–(2).

Upon Angulo-Mestas' default in May 2009 (Docket No. 1-18), WBPR ostensibly was entitled as a secured party to accelerate payment on the loan (Docket No. 1-2) and take possession of the accounts receivable. See § 2203. However, Angulo-Mestas assigned his right to receive such payments to Defendants in 2007. (See Docket No. 1-13.) DE confirms that it made remittances pursuant to the assignment. (Docket No. 61.) Thus, the funds deposited with this court constitute Angulo-Mestas' accounts. (See Docket Nos. 41; 61; 81; 87; 112; 119.)

Nevertheless, Defendants argue that they are entitled to priority as good-faith transferees of the accounts receivable, vis-à-vis Intervenor as a holder of an unperfected security interest.

(Docket No. 96.) Angulo-Mestas assigned his rights to the accounts receivable to Defendants in late 2007. (See Docket No. 1-13.) Defendants gave value for this assignment by relinquishing their rights to demand Angulo-Mestas and APPR's performance under the 1973 distribution agreement and to seek recovery from them for certain liabilities. (See Docket Nos. 1-13; 1-14.) Because Angulo-Mestas represented that he had full rights to the assigned payments (Docket No. 1-13), Defendants were unaware of WBPR's security interest in the accounts receivable.

WBPR did not perfect its security interest in Angulo-Mestas' accounts receivable until August 2009, when it filed copies of the security agreement with the Puerto Rico Department of State as part of a financing statement (Docket No. 59-2). See 19 L.P.R.A. § 2102(1). Because WBPR failed to perfect its security interest in the accounts receivable before Angulo-Mestas' assignment of said accounts, Defendants' claims as good-faith transferees defeat Intervenor's competing interest. See § 2101(1)(d).

Accordingly, Defendants, not Intervenor, are entitled to the "Trade Debt Payments" deposited with this court. As it appears that Defendants are entitled to judgment as a matter of law on their rights to the accounts receivable, we order Intervenor to show cause as to why we should not order summary judgment in favor of Defendants. See Stella, 4 F.3d at 55-56.

## IV.

### Conclusion

In view of the foregoing, we hereby **DENY** Intervenor's motion for summary judgment (Docket No. 66). We **DENY as MOOT** WBPR's motion for reconsideration (Docket No. 126) of our previous order for disbursement of funds (Docket No. 122), because we vacated that order (Docket No. 124). We **DENY** WBPR's motion for entry of default against Defendants (Docket No. 120) because Defendants have appeared in their defense (see Docket Nos. 62; 96). See Fed. R. Civ. P. 55(a). We **reserve judgment** on Defendants' motion for disbursement of funds (Docket No. 119) pending the resolution of the instant case. We **ORDER** Intervenor to **SHOW CAUSE on or before July 29, 2010,** as to why we should not order summary judgment in favor of Defendants.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 16th day of July, 2010.

                                                                s/José Antonio Fusté
                                                                JOSE ANTONIO FUSTE
                                                                Chief U.S. District Judge